1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

|  |  |
|---|---|
| SANDPIPER RESORTS DEVELOPMENT CORPORATION, *et al.*, | ) ) ) |
| Plaintiffs, | ) |
| vs. | ) |
| GLOBAL REALTY INVESTMENTS, LLC, *et al.*, | ) ) ) |
| Defendants. | ) ) |

**2:08-cv-01360 JWS**

**ORDER AND OPINION**

**[Re: Motion at Docket 292]**

## I.  MOTION PRESENTED

At docket 292, plaintiffs Sandpiper Resorts Development Corporation ("Sandpiper") and Dourian Foster Investments ("Dourian Foster": collectively "plaintiffs") move pursuant to Federal Rule of Civil Procedure 55(b)(2) for default judgment against defendants Global Realty Investments, LLC ("Global"); Caroline Hartman-Altenbernd ("Hartman") and her husband Kelly Altenbernd; and Toscana Developers, LLC ("Toscana Developers").   Defendant Estes Development Corporation ("Estes Development") opposes at docket 296, and plaintiffs reply at docket 300.  Oral argument was not requested.

**II.  BACKGROUND**

**A.  Jurisdiction and Governing Law**

The court has jurisdiction over the lawsuit by virtue of the parties' diverse citizenship and the amount in controversy.[1]  The claims pled are all state law claims which arise from events that took place in Arizona.  The case was filed in Arizona. Arizona law provides the substantive law to be applied.

**B.  Events Giving Rise to Lawsuit**

Sandpiper owned Toscana Villas–a partially completed townhouse development in La Paz County, Arizona.  The property was encumbered by two deeds of trust in favor of Point Center Financial ("Point Center").  Dourian Foster owned Toscana Estates, a 25-acre parcel adjacent to Toscana Villas.  Toscana Estates was encumbered by deeds of trust in favor of Ronald Gayman.  Damin Paige Dourian ("Dourian") was President and CEO of Sandpiper and the principal of Dourian Foster.

In January of 2007, Sandpiper filed a Chapter 11 bankruptcy case.  Under Sandpiper's bankruptcy plan, Toscana Villas was slated for sale at auction. Representatives of Sandpiper met with Hartman, the managing member of Global, to discuss Global's purchase of Toscana Villas and Toscana Estates two months prior to the sale.  Global retained the law firm Mohr Hackett to assist with the acquisition.

On August 24, 2007, Sandpiper and Global entered into a contract under which Global agreed to purchase Toscana Villas for $6,950,000.  In a separate contract, Global agreed to purchase Toscana Estates from Dourian Foster for $13,320,000. Toscana Developers, LLC ("Toscana Developers") was to be the assignee of Global's rights under each contract.  At least at one point, Estes Development was the managing member of Toscana Developers, and plaintiffs allege that Estes Development was the primary source of funding for the purchases.

---

[1]28 U.S.C. § 1332.

The sale of Toscana villas was approved by the bankruptcy court in an order confirming Sandpiper's plan of reorganization.[2]  According to Estes Development that order allocated a sale price of $6,950,000 as follows: $6,034,426.87 to pay off Point Center; $625,500 to pay the sales commission, $75,319.12 to pay miscellaneous secured claims, with the balance of $750,000 to be set aside to pay property association owner claims.  These figures are reflected in a table set out in Estes Development's response.[3]  However, plaintiffs dispute the accuracy of these numbers. This dispute is discussed below.

The sales were ultimately set to close on October 8, 2007, the same day that Hartman received an appraisal of Toscana Villas indicating a value of only $5,600,000. The next day Global advised Sandpiper it would not go through with the transaction.  On October 12, 2007, Point Center foreclosed one of its deeds of trust on Toscana Villas, and foreclosed the second on April 4, 2008.  Meantime, Global continued to negotiate with Point Center regarding the purchase of Toscana Villas and continued to negotiate with Dourian Foster regarding the purchase of the Toscana Estates.  Eventually, the Toscana Estates were also sold at a foreclosure sale.

The amounts paid at the various foreclosure sales are not disclosed in the motion papers.  At the time Point Center filed its claims in bankruptcy court, the amount owed to Point Center, which was secured by the Toscana Villas, was $5,272,165.52 consisting of one loan on which it was owed $4,620,914.52 and another on which it was owed $651,251.00.[4]

**C. Procedural History**

Plaintiffs commenced this action on July 25, 2008, naming Global, Hartman, Kelly Altenbernd, and Toscana Developers as defendants.  The complaint set out seven

[2]Doc. 296 at 30-33 (excerpt).

[3]Doc. 296 at 12.

[4]Doc. 296 at 46-49.

claims denominated as "counts."[5]  Count One is Dourian Foster's breach of contract claim against Global and Toscana Developers.  Count Two is Dourian Foster's specific performance claim against Global and Toscana Developers.  Count Three is Sandpiper's breach-of-contract claim against Global and Toscana Developers.  Count Four is Sandpiper's fraud claim against Global, Toscana Developers, and Hartman.  Count Five is a negligent misrepresentation claim by Dourian Foster and Sandpiper against Global, Toscana Developers, and Hartman.  In Count Six, Dourian Foster and Sandpiper ask the court to disregard the corporate forms of Global and Toscana Developers and hold Hartman personally liable as their principal.  Count Seven is a claim by Sandpiper against Global, Toscana Developers, and Hartman for violation of 11 U.S.C. § 363(n).

Toscana Developers was served on September 3, 2008, but did not appear.  The Clerk entered the default of Toscana Developers on December 8, 2008.[6]  Global was not served until November 26, 2008.  Like Toscana Developers, it failed to appear, and Global's default was entered by the Clerk on May 28, 2009.

Hartman and husband Kelly Altenbernd were finally served on June 5, 2009.  They obtained counsel and filed a motion to dismiss on the grounds that service of process was insufficient.[7]  However, their lawyer withdrew.  Judge Murguia, to whom this case was then assigned, denied the motion to dismiss and permitted plaintiffs to serve Hartman and her husband by publication.[8]  Following service by publication, they failed to appear, and their default was entered on March 1, 2010.[9]

---

[5]Docs. 11, 11-1, 11-2, 11-3 and 11-4.  It appears that the complaint was filed in segments because it was scanned into ECF.

[6]Doc. 17.

[7]Doc. 33.

[8]Doc. 46.

[9]Doc. 61.

1    In the meantime, on October 8, 2009, plaintiffs filed an amended complaint which

2    added Estes Development and its principal, Cynthia Estes, as defendants.[10]  The

3    amended complaint set out the same seven claims denominated as Counts One

4    through Seven as the original complaint and added Count Eight through Twelve against

5    defendants Estes Development and Cynthia Estes.  These defendants were also

6    defaulted, but Judge Murguia granted their motion to set aside their default.[11]  On

7    July 19, 2011, the Estes Defendants filed a third-party complaint naming  Mohr Hackett.

8    This court granted Mohr Hackett's motion for summary judgment on the third-party

9    complaint.[12]  This court also granted the motion by Estes Development and Cynthia

10   Estes for summary judgment on all the claims against them, except the claim to pierce

11   the corporate veil of Toscana Developers and hold Estes Development liable for the

12   actions of Toscana Developers which is included in Count Ten.[13]

13   In an order at docket 287, this court invited plaintiffs to file a motion for entry of a

14   default judgment as to the defaulted defendants.  The order recognized that Estes

15   Development should be heard on that topic, because the veil-piercing claim might leave

16   Estes Development responsible for any judgment entered against Toscana Developers.

18   **III.  DISCUSSION**

19   Jurisdiction in this case is based upon diversity of citizenship.  All of the events

20   giving rise to the litigation took place in Arizona.  The substantive law which applies to

21   the resolution of this lawsuit is the law of Arizona.

---

25   [10]Doc. 38.

26   [11]Doc. 85.

27   [12]Doc. 286.

28   [13]*Id.*

-5-

**A.  Issue Not Presently Before the Court**

Estes Development devotes a substantial portion of its response to the proposition that it is not bound "directly or indirectly" by a default judgment against Toscana Developers.  The court declines to consider this argument, because it concerns an issue beyond the scope of the motion practice the court invited.  When the court invited a response from defendant Estes Development, it explained that Estes Development had a contingent interest in damages that might be awarded in a default judgment.[14]  If plaintiffs succeed in piercing Toscana Developers' corporate veil, Estes Development might be liable for any default judgment entered against Toscana Developers.  That veil has not been pierced, and it is premature to consider the extent to which Estes Development might be liable for a default judgment against Toscana Developers.  The issues to be resolved now are limited to (1) whether to enter a default judgment against the defaulted defendants, and if so, (2) what amount of damages should be reflected in the judgment.

**B.  Damages**

**1.  Injury is Inherent in Default**

Estes Development contends that plaintiffs suffered no damages by virtue of the failure to close the contemplated sales of Toscana Villas and Toscana Estates.  It makes several arguments, one of which needs to be addressed at the outset.  It is the argument that the existence of "at least some damages"[15] is not inherent in the entry of Toscana Developers' default.  In support of this proposition, Estes Development points to the unremarkable proposition that before a default judgment can be entered, the court must determine the amount of damages.  Yet, it is nevertheless true that because some injury to a plaintiff is a necessary element of any claim for relief, the proposition that the defaulting defendant caused some injury to the plaintiff is implicit in any default.

---

[14]Doc. 287.

[15]The court said precisely this in its order at docket 286.

1   Of course, after the entry of default, it remains to be determined whether a plaintiff can

2   prove a quantum of damages appropriate to compensate for the injury.

3       **2. Damages under Fraud Theory**

4       In the memorandum supporting its motion, plaintiffs seek an award of damages

5   based on fraud theories equal to the purchase price expressed in each sale contract,

6   plus consequential damages in the form of attorneys' fees and property taxes; and in

7   the case of Toscana Estates, additional costs associated with selling the property in

8   2008 and 2009.  Thus calculated, the damages plaintiffs seek are $7,015,068.98 for the

9   Toscana Villas and $13,374,420.19 for the Toscana Estates.[16]

10      The court begins with the observation that no fraud claim was pled with respect

11  to the Toscana Estates transaction.  Rather, the only fraud claim pled is Sandpiper's

12  claim which relates to the Toscana Villas transaction.  The claim appears in Count Four,

13  and the gravamen of the claim is that Global, Hartman, and Toscana Developers knew

14  that "Global did not have in place the requisite financing that would allow Global to pay

15  Sandpiper the agreed upon $6,950,000 for the Toscana Villas," but hid this fact from

16  Sandpiper and wrongfully represented to the bankruptcy court that the transaction could

17  proceed.[17]  The defaulting defendants have admitted the truth of this claim.  Thus, the

18  question becomes what damages have been proved.

19      In plaintiffs' motion papers they contend that where fraud is involved, "Arizona

20  applies the benefit of the bargain rule."[18]  Plaintiffs rely on *Bechtel v. Liberty Nat.'l*

21  *Bank,*[19] which does support that rather unremarkable proposition.  Plaintiffs do not,

22  however, cite any authority for the more remarkable proposition that when the benefit of

23  the bargain rule is applied in a fraud case, a plaintiff is entitled to a windfall consisting of

24  _____

25      [16]Doc. 292 at 11-12.

26      [17]Doc. 11-3 at 1-2.  The same assertions appear in the amended complaint at doc. 38.

27      [18]Doc. 292 at 11.

28      [19]534 F.2d 1335 (9th Cir. 1976) (applying Ariz. law).

an award of the entire purchase price with no reduction to reflect either the portion of the purchase price, which would have been paid to a third-party lender with a security interest in the property or the fair market value of the property.  Perhaps realizing the ice under their skates on this part of the lake is thin, plaintiffs abandon this approach in their reply memo contending instead that the award in a "breach of contract or fraud in the sale of real property" requires an offset, but the offset should be the amount paid at the foreclosure sale, rather than the fair market value as contended by Estes Development.[20]  The fraud claim pled in Count Two does not support a damage award, which is not reduced either by the fair market value of the property or the amount paid at the foreclosure sale.  There is no evidence of the market value of Toscana Villas in the motion papers.  Similarly, there is no evidence of the amount paid at either of the foreclosure sales.[21]  The consequences of this failure of proof are discussed in Subsection III. B. 5. below.

Plaintiffs also contend that a fraud theory entitles them to collect consequential damages comprised of $55,000 in attorneys' fees incurred after the closing date for the Toscana Villas sale on October 9, 2007, and additional taxes paid on Toscana Villas of $10,068.98.  These amounts, which total $65,068.98, are supported by the declaration of Damien Paige Dourian.[22]  Estes Development asks the court to ignore this affidavit on the grounds that it is inconsistent with Ms. Dourian's deposition testimony.  In her deposition, Ms. Dourian conceded that if the sale of Toscana Villas had closed,

---

[20]Doc. 300 at 6.

[21]The court is aware that Ms. Dourian's declaration at docket 292-1 states the amount due to Point Center, but even assuming the declaration may be considered for purposes of establishing that amount despite her deposition testimony, the plain fact is that the declaration does not show the actual bids at the foreclosure sales by Point Center.  This is surely a matter of record and could easily have been established through objective evidence without any need to rely on the declaration of Ms. Dourian.

[22]Doc. 292-1 at 5, ¶ 13.  It is noted that Ms. Dourian incorrectly summarized the total of the consequential damages items listed in ¶ 13 as $76,375.69 in ¶16 of the declaration.

-8-

"Sandpiper would not have just walked away with $6,950,000."[23]  She went on to say that without doing the math in her head the amount would have been very minimal.[24]  The court does not read this testimony as inconsistent with a claim for consequential damages in the form of the attorneys' fees and additional taxes.  While in the abstract $65,000 may not seem minimal, in relation to the $6,950,000 also being discussed in that segment of the deposition, it may fairly be so described.  Furthermore, the fact that Ms. Dourian referred to the need to do some mathematical calculations is consistent with calculating consequential damages.  Whatever role the deposition testimony might play in connection with the larger damage claims, it is not adequate to overcome Ms. Dourian's affidavit insofar as consequential damages are concerned.

In summary, plaintiffs have proved compensatory damages on their fraud theory in the amount of $65,608.98.  Whether this sum may be included in a default judgment turns on the court's disposition of the parties' argument over the liquidated damages terms which appear in both sales contracts.

### 3.  Specific Performance Claim Not Considered

Estes Development asserts: "On both transactions, Plaintiffs' damages theories begin with an action for the purchase price–as if Plaintiffs are entitled to specific performance of the contracts."[25]  The first thing to note is that Dourian Foster pled a claim for specific performance relating to the sale of Toscana Estates against Toscana Developers in Count Two of the Complaint, but Sandpiper pled no specific performance claim with respect to Toscana Villas.[26]  The second thing to note is that plaintiffs have not advanced any argument for an award of damages based on the specific

---

[23]Doc. 296 at 39 (Deposition at 222).

[24]*Id.*

[25]Doc. 296 at 8.

[26]Docs. 11 and 38.

1  performance claim pled in Count Two.  The court therefore will not consider whether the

2  default on the specific performance claim would support any award of damages.[27]

3  ### 4.  Claims in Counts Five, Six, and Seven Not Considered

4  Plaintiffs pled and defaults were entered on the claims pled in Count Five for

5  negligent misrepresentation, Count Six for piercing the corporate veil of Global and

6  Toscana Developers, and Count Seven for violation of 11 U.S.C. § 363(n).  As with the

7  claim for specific performance, plaintiffs have failed to present any argument citing

8  points and authorities to support an award of damages on these theories.  The court

9  therefore will not consider awarding any damages on any of these claims.[28]

10  ### 5.  Breach-of-Contract Damages

11  Plaintiffs offer different and substantially lower calculations of their damages with

12  respect to the breach-of-contract claims than they offer in connection with the fraud

13  theory.  On the two breach-of-contract claims (Count One relating to Toscana Estates

14  and Count Three relating to Toscana Villas), plaintiffs indicate that the award should be

15  determined after deducting Ms. Dourian's estimate of what was owed to the creditors

16  from the contract price plus consequential damages.  Using that approach, plaintiffs

17  calculate the damages relating to the Toscana Villas to be $1,013,072.99 and the

18  damages relating to Toscana Estates to be $11,321,920.19.[29]

19  Basic contract law principles hold that where one party has breached a contract,

20  the measure of damages is the amount which puts the non-breaching party in the

21  position it would have enjoyed but for the breach.  One Arizona appellate court has

22  explained that the "'universal rule' [is] that the measure of damages in a breach-of-

23

24

---

25  [27]See Local Rule 7.2(b) requiring that a moving party set out the "points and authorities
26  relied upon in support of the motion."

27  [28]Id.

28  [29]Doc. 292 at 14-15.

-10-

contract action is the loss actually sustained."[30]   Citing another Arizona case, *Peery v. Hansen,*[31] Estes Development's argues plaintiffs cannot prove damages without evidence of the fair market value of Toscana Villas and Toscana Estates at the time of the breach.  In the *Peery* case, the Hansens contracted to sell their bicycle shop to Peery for $13,500 plus the value of the inventory above $5,000.  Peery made a down-payment, took possession of the shop, but two days after the sale closed abandoned the shop.  The Hansens regained possession and then re-sold the bicycle shop to a third party for $9,000.  The trial court awarded damages based on the contract price less the fair market value of the shop, which it determined had been established by the $9,000 re-sale price.  On appeal the appellate court concluded that on the record before it, the evidence of fair market value had to be considered sufficient proof, and the court approved measuring damages as the difference between the contract price and the fair market value.[32]

After Peery's breach, the Hansens recovered the bicycle shop which they then resold at fair market value.  In the case at bar, plaintiffs lost Toscana Villas and Toscana Estates and so had nothing to re-sell as a consequence of the defaulting parties' conduct.  Plaintiffs contend that in such a circumstance, the damages should be measured by the agreed purchase price reduced by the amount owed the creditors as calculated by Ms. Dourian.  To support their position, plaintiffs direct the court's

---

[30]*Meyer v. Lee Collins Air Conditioning Co.*, 2008 WL 2154798, at *6 (Ariz. Ct. App. May 20, 2008).

[31]585 P.2d 574, 576 (Ariz. Ct. App. 1978), as well as a decision from Texas.

[32]Thus, the case was affirmed as to the Hansens' breach-of-contract claim, but it was reversed with respect to one of Peery's counterclaims.

attention to the district court decision in *Crown Life Ins. Co. v. Am. Nat.'l Bank and Trust Co. of Chicago*[33] and a bankruptcy court decision, *In Re Gatlinburg Motel Enterprises.*[34]

As outlined by the trial court in the *Crown Life* case, the litigation arose out of the financing of three shopping centers ("property").  Crown Life loaned $2,812,500 secured by a mortgage on the property.  Title to the property was held in trust by American National Bank and Trust for the trust beneficiary Tri-Centers, which also had the power to control the trust.  In addition to the mortgage, the property was subject to a collateral agreement in which Tri-Centers assigned all of its interest in the property to Crown Life.

With Crown Life's consent, the trust contracted to sell the property to Aronson for $4.3 million payable in installments.  Aronson promptly stopped making payments, and the trust sent him a notice of default.  In June of 1992 when the trust failed to make the payment then due to Crown Life as assignee of the trust's interest in the property, Crown Life accelerated the debt.  Litigation was initiated by Crown Life.  Tri-Centers answered the complaint and filed a cross claim against Aronson seeking the balance owed on the purchase contract.  Thereafter, the court entered a judgment of foreclosure on the property, which was bid in at the ensuing foreclosure sale by Crown Life for $2.2 million.  That left $1,126,000 still owing to Crown Life.

After finding that Crown Life was the real party in interest on Tri-Centers' cross-clam against Aronson, the court addressed the amount of damages which Aronson would have to pay on the cross claim.  After noting that the traditional measure of damages would be the difference between the contract price and the market value of the property, the court added that under Illinois law "the price paid at a fair foreclosure sale is presumptively considered to be the market value."[35]  It then held that the amount

---

[33]830 F.Supp. 1097, 1101 (N.D. Ill. 1993), *aff'd,* 35 F.3d 296 (7th Cir. 1994).

[34]127 B.R. 814 (Bankr. E.D. Tenn. 1991) (applying Tennessee law).

[35]830 F.Supp. at 1101 (citation omitted).

-12-

1   Aronson must pay was the amount owed on the installment contract less the amount

2   paid by Crown Life at the foreclosure sale.

3       The bankruptcy court which decided *In Re Gatlinburg Motel Enterprises* cited a

4   Tennessee supreme court decision for the proposition that one who contracts to sell

5   real estate is entitled to recover as damages from a breaching purchaser an amount

6   equal to the difference between the agreed sales price and the fair market value.  The

7   bankruptcy court effectively determined that the damages in the case before it were the

8   difference between the contract price and the amount paid by a third party (not the

9   lender) in a foreclosure sale.

10      *Crown Life* applied a presumption arising under Illinois law to the effect that the

11  price paid at a "fair" foreclosure sale is the fair market value of the property foreclosed.

12  *Crown Life* does not explain what makes a foreclosure sale "fair."  Here, there is nothing

13  to show why the foreclosure sales were "fair."  Rather, it is virtually certain that what

14  was paid at the foreclosure sale was derived from what was due on the loans being

15  foreclosed.  There is no theoretical equivalence between a price derived from a loan

16  balance and the fair market value of the collateral.  Neither is there any evidence before

17  the court which shows that to be the case for any of the foreclosure sales.  Finally, there

18  is no evidence of what was actually paid at the foreclosure sales.  There is only Ms.

19  Dourian's affidavit showing her calculations of what was owed to the creditors.  The

20  court finds it remarkable that plaintiffs rely on case law explicitly based on the prices

21  paid at foreclosure sales, but fail to offer any evidence of what was paid at the

22  foreclosure sales in this case.

23      The *In Re Gatlinburg* court assumed without analysis that a foreclosure sale to a

24  third party established market value.  Here, there was no sale to a third party.  Even if *In*

25  *re Gatlinburg* were persuasive, its' rationale does not fit the facts in the case at bar.

26      Neither the parties nor the court have found an Arizona decision that directly

27  addresses whether a foreclosure sale price may be used in lieu of fair market value to

28  calculate damages in a breach of contract for the sale of real estate.  Nevertheless, this

-13-

court concludes that in a situation where a defaulting buyer's action causes a seller to lose title to real property in a foreclosure sale, application of the "universal rule" of contract damages recognized in Arizona[36] calls for the calculation of damages to be based on the contract price less the amount paid at the foreclosure sale.  This is so, because any residual market value above the foreclosure price would be transferred to the foreclosing lender without the lender paying anything for it above the price paid at the foreclosure sale.  This is illustrated in the following two hypothetical cases:

> Hypothetical 1:  A owns Blackacre free and clear and contracts to sell it to B for $10,000.  B defaults.  Blackacre's fair market value is $8,000.  A's actual loss is $2,000 but no more because A keeps Blackacre.

> Hypothetical 2: A owns Blackacre subject to a $7,000 lien in C's favor.  B agrees to purchase Blackacre for $10,000 but defaults.  Blackacre's value is $8,000.  A had relied on the sale to keep payments to C current, so A defaults.  C forecloses and bids $7,000 discharging A's obligation to C. A's actual loss is $3,000, not $2,000, because C purchased Blackacre worth $8,000 but paid only $7,000.  To be made whole A is entitled to the $2,000 differential between the contract price and the market value plus the $1,000 lost when an $8,000 asset went to C for $7,000.  A's damages are the difference between the contract price and the foreclosure sale price, not the difference between the contract price and fair market value.

Plaintiffs have the better of it with respect to the argument over methodology. However, plaintiffs' proof fails, because the prices paid at the foreclosure sales are not known.  Ms. Dourian's estimate of the amount of the debt owed to the secured creditors,

---

[36] *Meyer,* 2008 WL 2154798, at *6.

even if it can be considered despite her deposition testimony, is not an acceptable substitute for the prices paid at the foreclosure sales, prices which might differ from her estimates.

Given the failure of proof, the court might rule that plaintiffs are entitled to no damages (other than any consequential damages proved), but this would be antithetical to the overarching interest in deciding the question of damages on its merits, especially when there is evidence to support the inference that plaintiffs lost at least some value as a result of the foreclosure sales wholly independent of Ms. Dourian's disputed affidavit. With respect to Toscana Villas, there is evidence that at the time the sale was to have closed, the property was worth only $5,600,000, the amount shown in a recent appraisal. There is also evidence at the time when Point Center filed its claims in bankruptcy court it was owed less than $5.3 million. Given the sale price of $6,950,000, an inference may be drawn that Sandpiper's injury was $1 million or more. With respect to Toscana Estates, even Estes Developments' calculation of possible damages shows Dourian Foster's damages may have exceeded $600,000.[37] Thus, but for the court's conclusion in Subsection III. B. 8. below, it would be appropriate to convene an evidentiary hearing and afford plaintiffs an opportunity to present additional evidence.

**6. Lack of Damages on Toscana Villas Sale**

Without regard to the dispute over how to value contract damages under Arizona law, given the peculiar facts of this case, Estes Development says that the bankruptcy court approved allocation of the sale proceeds for the sale of Toscana Villas shows there would have been nothing left from the sale proceeds to pay plaintiff Sandpiper. Estes Development's position is reflected in the chart below:[38]

---

[37]Doc. 296 at 16.

[38]*See* doc. 296 at 12.

| Toscana Villas Sales Price | $6,950,000.00 |
|---|---|

Less:

| Sales Commission | $ 625,500.00 |
|---|---|
| Misc. Secured Claims | $   75,319.12 |
| Point Center Claim | $6,034,426.87 |
| Association Owner Claims | $   750,000.00 |

| Negative Net to Sandpiper | $ (-535,245.99) |
|---|---|

Of course, if this were correct, plaintiffs could have no damages relating to the sale of Toscana Villas regardless of general contract law damage principles.

There is a flaw in Estes Development's use of the chart which renders it useless for present purposes.  Concerning the two largest entries in the chart, the amount set aside for Point Center and the amount set aside for association owner claims, Estes Development simply assumes that the amounts set aside are the amounts eventually paid.  Thus, the $6,034,426.87 set aside for Point Center is treated as the amount actually paid to Point Center.  This treatment is at odds with the bankruptcy court's order which segregated that amount and ordered it to be held by Sandpiper pending the court's further order or an agreement between Sandpiper and Point Center.[39]  Estes Development points to no evidence that the amount actually paid to Point Center was $6,034,426.87.  Similarly, the $750,000 set aside for association owner claims was described in the bankruptcy court's order as a "not to exceed" "carve out."[40]  While the bankruptcy court did contemplate the possibility that the association owner claims could exceed $750,000, there is no finding by the bankruptcy court as to the actual amount to be paid on those claims, nor do the motion papers disclose what was paid.  Estes Development's argument cannot be used to eliminate an award of damages associated with breach of the Toscana Villas sales contract.

---

[39] *See* Order Confirming Chapter 11 Plan, doc. 296 at 31-32, ¶ 5.

[40] *Id.* at 32-33, ¶7.

-16-

**7.  Toscana Estates Contract Terminable at Will**

Plaintiffs contend that the damages for breach of the contract to purchase the Toscana Estates amount to $11,321,920.19.[41]  This figure is based on a calculation in Ms. Dourian's declaration, consideration of which Estes Development asserts is improper in light of her deposition testimony.  In any event, Estes Development says no damages can be established because the purchase contract for the Estates was terminable at will.[42]  Estes Development directs the court to the following provision in the contract:

(2) Additional Earnest Money and Feasibility Period

(a) Feasability Period.  Purchaser's obligations under this Agreement are expressly contingent on Purchaser's written approval and acceptance in its sole discretion of the feasibility of this project.  Purchaser shall have [a specified period of time] within which to  approve or disapprove in writing the feasibility of this transaction . . .  If purchaser fails to provide written notice to Seller and Escrow Agent of Purchaser's approval or disapproval, Purchase will be deemed to have disapproved this transaction and this Agreement shall be automatically deemed terminated.[43]

In their reply plaintiffs do not address this argument.  Nevertheless, the argument fails. The reason is that by defaulting, the defaulted defendants admitted Dourian Foster's allegation that, "Defendant buyer Global and its assignee Toscana Developers, LLC breached their contract with Plaintiff seller Dourian Foster when, without justification, the Defendant Global and its assignee the Defendant Toscan Developers LLC failed and refused to close escrow on its purchase of . . . Toscana Estates."[44]

---

[41]Doc. 292 at 15.

[42]Doc. 296 at 14.

[43]Amended and Restated Purchase Sale and Agreement, doc. 296 at 64-65 (extract).

[44]Count Two of the Complaint, doc. 11-2 at ¶42.

### 8.  Liquidated Damages

The contract for the sale of Toscana Villas contains a liquidated damages clause which provides a remedy for the Seller if the purchaser's breach continues beyond a specified cure period:

> Seller as its sole remedies may terminate this Agreement, in which event the Earnest Money, plus net accrued interest, if any, shall be due and payable to Seller as its liquidated damages. * * * The parties agree that actual damages in the event of default are difficult to ascertain and further agree that the amount set forth as liquidated damages is a reasonable estimate of the damages to Seller in the event of Purchaser's default. Such sum is intended to be liquidated damages, and not a penalty."[45]

The contract for the sale of Toscana Villas contains an identical liquidated damages clause.[46]

If these provisions are enforceable, then plaintiffs' damages are limited to the amount of the earnest money deposits.  Arizona courts have held that a liquidated damages clause in a contract for the sale of real estate is enforceable.[47]  Plaintiffs seek to avoid application of the liquidated damages clauses on several grounds.

First, plaintiffs argue that the defaulted defendants repudiated the contracts and therefore cannot rely on the terms of the contract.[48]  Plaintiffs rely primarily on *Rancho Pescado Inc. v. Northwestern Mut. Life Ins. Co.*[49] to support the proposition that one who repudiates a contract may not then rely on it.  In that case the court held that establishing an anticipatory repudiation required unequivocal proof that the repudiating party was not going to render the performance owed.  Thus, when one party to the

---

[45]Purchase and Sale Agreement, doc. 296 at 28, ¶ 14. A.

[46]Amended and Restated Purchase and Sale Agreement, doc. 296 at 24, ¶ 14. A.

[47]*E.g., Roscoe-Gill v. Newman*, 937 P.2d 673, 675 (Ariz. Ct. App. 1996).

[48]Doc. 292 at 18-19.

[49]680 P.2d 1235 (Ariz. Ct. App.1984).

-18-

contract wrote a letter to the other, which "clearly intended to terminate [the contract]",[50] there was an anticipatory repudiation.  Here, plaintiffs point to nothing to show an anticipatory repudiation of either sales contract.  Rather, what the record discloses is that there was a failure to close the purchases.  These failures to perform were breaches of contract, not repudiations.

Next, plaintiffs argue that the defaulted defendants' fraud prevents reliance on the liquidated damages provisions.[51]   With respect to this contention both sides rely on *Roscoe-Gill v. Newman*.[52]  Before considering the application of that case to the facts here, it is useful to reiterate that the only "fraud" claim pled and admitted by default is plaintiff Sandpiper's claim in Count Four which relates to Toscana Villas.  There is no claim of "fraud" pled by plaintiff Dourian Foster relating to the Toscana Estates transaction.  The allegations of fraud in Count Two are that the defaulting defendants knew that Global did not have the financial backing needed to close the Toscana Villas transaction, but nevertheless misrepresented the situation by telling Sandpiper and the bankruptcy court that Global would be able to make a cash payment to close the transaction and urged the bankruptcy court to approve the proposed transaction, and in making the representations were motivated by "spite or ill will, or acted to serve their own interest."[53]

In *Roscoe-Gill*, the Arizona appellate court upheld the enforcement of a liquidated damages clause in a real estate sales transaction.  There, the plaintiff pled only a claim for breach of contract, and the appellate court noted that there was no evidence of fraud.  The case did not actually consider whether fraud would render a liquidated damages provision unenforceable, although by pointing out that there was no

---

[50]*Id.*, 680 P.2d at 1247.

[51]Doc. 292 at 19.

[52]937 P.2d 673 (Ariz. Ct. App. 1996).

[53]Doc. 11-3 at 2-3, ¶¶ 60, 62, 63, and 73.

-19-

1  evidence of fraud, the court implied that evidence of fraud would be relevant.  Estes

2  Development's assertion that the behavior of the buyer in the *Roscoe-Gill* case is

3  essentially the same as the behavior established by the default on Count Two is

4  incorrect.  The buyer in the *Roscoe-Gill* case was forthcoming and honest with respect

5  to all of the extensions in the closing date for the sale.  The problem was that in the end,

6  he lacked the funds to make the purchase.

7      In Arizona, the "traditional role of liquidated damages provisions is to serve as an

8  economical alternative to the costly and lengthy litigation involved in a conventional

9  breach of contract action, and efforts by contracting parties to avoid litigation and to

10 equitably resolve potential conflicts through the mechanism of liquidated damages

11 should be encouraged."[54]  Even though the breach of the Toscana Villas contract

12 involves fraud, enforcement of the liquidated damages provision serves the same

13 interest as it did in *Roscoe-Gill,* where there was no fraud pled or proved.  In the

14 absence of a case more closely in point–and the parties cite none–the court concludes

15 that the general explanation and endorsement of liquidated damages provisions

16 reflected in Arizona case law renders plaintiffs' "fraud negates use of liquidated

17 damages provision" argument unpersuasive in the case at bar.

18     Next, plaintiffs urge that the liquidated damage provision cannot be enforced by

19 Estes Development, an entity that was not a party to the contract.[55]  In advancing this

20 argument, plaintiffs lose sight of the task at hand.  It is to determine what damages

21 should be assessed against Global; Global's assignee, Toscana Developers; and its'

22 principal, Hartman.  Global was a party to the contract for the sale of Toscana Villas,

23 and the court cannot see any reason why Global's ability to rely on the liquidated

24 damages provision would not extend to its assignee and its principal, whose liability

25

26

27     [54]*Pima Sav. and Loan Ass'n v. Rampello*, 812 P.2d 1115, 1117 (Ariz. Ct. App. 1991).

28     [55]Doc. 292 at 19-20.

1  necessarily derives from the breach by Global with which they were intimately

2  connected.

3      Plaintiffs also argue that the liquidated damages provision was waived because

4  the earnest money deposit was not made.[56]  Estes Development responds to this

5  argument by contending that plaintiffs could have demanded payment of the earnest

6  money, but did not.  The cases cited by plaintiffs[57] do not involve liquidated damages

7  provisions and do not provide guidance useful in connection with the liquidated damage

8  clauses here.  As the court assesses the argument, the failure to deposit the earnest

9  money does not affect the fact that using liquidated damages measured in the amount

10  of the earnest money deposit fulfills the underlying purpose of a liquidated damage

11  clause.  Because the earnest money deposits were not made, plaintiffs are entitled to a

12  judgment against the defaulting defendants in the amount of the earnest money

13  deposits, but the failure to make the deposits does not constitute a waiver.

14      Plaintiffs final argument is that a liquidated damages term may not be used

15  where there has been a breach of the implied covenant of good faith and fair dealing,

16  citing *United Dairymen of Arizona v. Schugg*[58]  *Schugg* involved a case where there

17  were both a breach-of-contract claim on which the jury returned a verdict for the

18  defendant and a claim for violation of the covenant of good faith and fair dealing on

19  which the jury returned a verdict for the plaintiff.  Whatever the teaching of *Schugg*, it

20  cannot apply here, because plaintiffs did not plead and the defaulting defendants have

21  therefore not admitted that there was a breach of the covenant of good faith and fair

22  dealing.[59]

---

[56]*Id.* at 20.

[57]*Am. Cont'l Life Ins. Co. v. Ranier Constr. Co.*, 607 P.2d 372 (Ariz. 1980); *Shea North, Inc. v. Ohio Casualty. Ins. Co.*, 564 P.2d 1263 (Ariz. Ct. App. 1977).

[58]128 P.3d 756, 758 (Ariz. Ct. App. 2006).

[59]Doc. 11-2 at 5 (Count One) and 7-8 (Count Three).

1    In summary, none of plaintiffs' arguments seeking to avoid application of the

2 liquidated damages terms has merit.  The liquidated damages provision in each sales

3 contract is clear on its face, enforceable, and effectively limits plaintiffs' breach-of-

4 contract damages to the amount of the earnest money due on the Toscana Villas

5 contract and the Toscana Estates contract.  The amount of the earnest money deposit

6 due on the Toscana Villas contract was $347,500.[60]  The amount of the earnest money

7 deposit for the Toscana Estates transaction was $200,000.[61]

8    **9. Punitive Damages**

9    Analysis of the claim for punitive damages must begin with the observation that

10 plaintiffs' arguments rely exclusively on the fraud claim.  This is the only fair reading of

11 their arguments in favor of an award.[62]   Moreover, as pointed out in Subsections III. B.

12 3. and 4. above, plaintiffs have advanced no argument to support an award of

13 compensatory damages based on the claims pled in Counts Two, Five, Six, and Seven.

14 The court will not consider imposing punitive damages in connection with claims where

15 no compensatory damages can be awarded.  Of the claims plaintiffs' motion papers do

16 advance to support an award of compensatory damages, only one includes a request

17 for punitive damages.  It is the fraud claim pled as Count Four by Sandpiper in

18 connection with the Toscana Villas transaction.  There being no claim for punitive

19 damages in connection with the Toscana Estates transaction, the court will not award

20 punitive damages in connection with that transaction.

21

22

23

24

25    [60]Doc. 223-8 at 4.

26    [61]Doc. 224-8 at 4; doc. 296 at 64.  This includes both the initial earnest money of
27 $50,000 and the additional earnest money of $100,00 due, because the contract was not
terminated at will as argued by Estes Development.  *See* Subsection III. B. 7. above.

28    [62]Doc. 292 at 15-18.

-22-

1    In Arizona punitive damages are awarded only against a defendant who had an

2    "evil mind"[63] and the standard of proof is "clear and convincing evidence."[64]  The court

3    agrees with plaintiffs that the defaulted defendants have conceded liability for punitive

4    damages with respect to the Toscana Villas transaction by virtue of their default on

5    Count Four.  What remains is to determine the amount of any such damages.

6    Arizona law provides that punitive damages are for the purpose of punishing the

7    wrongdoer and deterring others from the same sort of conduct.[65]  In assessing punitive

8    damages "there is no exact monetary standard."[66]  One factor that should be considered

9    is the wealth of the person or entity against whom punitive damages are to be

10   awarded.[67]  The United States Supreme Court has indicated that the most important

11   consideration in assessing punitive damages is the reprehensibility of a defendant's

12   actions.[68]  However, it is also clear that the measure of punitive damages must bear an

13   appropriate relationship to the amount of compensatory damages awarded in order to

14   avoid due process problems.  A rule of thumb applicable in at least some cases limits

15   punitive damages to more than three times the compensatory damages.[69]

16   Here, the conduct supporting an award of punitive damages is fraud in

17   connection with a real estate sales contract.  More specifically, the conduct was failing

18   to timely disclose that a contemplated real estate transaction could not proceed, and

19   misleading both the seller and the bankruptcy court overseeing reorganization of the

---

[63]*Linthicum v. Nationwide Life Ins. Co.*, 723 P.2d 675, 679 (Ariz. 1986).

[64]*Id.*, 723 P.2d at 681.

[65]*Linthicum*, 723 P.2d at 679.

[66]*Wilson v. Riley Whittle, Inc.*, 701 P.2d 575, 580 (Ariz. Ct. App. 1984).

[67]*State v. Sanchez*, 579 P.2d 568, 571 (Ariz. Ct. App. 1978).

[68]*BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996).

[69]*See Southern Union Co. v. Irvin*, 563 F.3d 788 (9th Cir. 2009).

1  seller's affairs.  This was done in an attempt to secure the real estate at a lower price

2  than the contract price.  To be sure this was conduct undertaken by defendants

3  "consciously aware of the needs and rights of [plaintiffs] and nevertheless [done by

4  ignoring their] obligations."[70]  Yet, this conduct is not sufficiently reprehensible to

5  support an award above the rule of thumb three times the amount of compensatory

6  damages.  As determined above, the total amount of compensatory damages relating to

7  the Toscana Villas transaction is $347,500.

8       The court must also take into account the net worth of the defaulted parties.  The

9  motion papers provide no direct evidence of any defaulted defendant's net worth, but

10  they do provide facts from which it is possible to infer that the net worth must be very

11  modest.  First, plaintiffs' strenuous efforts to pierce the corporate veils of both Global

12  and Toscana Developers strongly suggests that these entities have few, if any, assets.

13  Furthermore, the effort in the claims pled in the amended complaint to reach Ms. Estes

14  and Estes Development strongly suggests that Hartman has at most modest assets.

15  Beyond that, it is evident from the very fact that Hartman, Global, and Toscana

16  Developers suffered default, rather than defending against the multi-million dollar claims

17  brought against them, show they have little or no net worth.  The court is left to conclude

18  that Hartman, Global, and Toscana Developers have a combined net worth that is very

19  modest.  With respect to deterring similar conduct by others who, like the defaulting

20  defendants, are of modest means, an award of punitive damages in the range of

21  $300,000 to $400,000 would be adequate.

22       Taking into account the degree of reprehensibility of the defaulting defendants'

23  conduct, the modest net worth of the defaulting defendants, compensatory damages in

24  the amount of $347,500, and what would be required to deter others similarly situated

25  from engaging in like conduct, the court concludes that an award of punitive damages of

26  $400,000 is appropriate.

27  _____

28       [70]*Linthicum*, 723 P.2d 681.

-24-

**IV.  CONCLUSION**

For the reasons set out above, the motion at docket 292 is **GRANTED in part and DENIED in part** as follows:

(1)  Plaintiff Sandpiper shall have judgment against defaulting defendants Global Realty Investments, LLC; Caroline Hartman-Altenbernd; Kelly Altenbernd; and Toscana Developers, LLC jointly and severally in the amount of $747,500, which consists of compensatory damages in the amount of $347,500 and punitive damages in the amount of $400,000.

(2) Plaintiff Dourian Foster shall have judgment against defaulting defendants Global Realty Investments, LLC; Caroline Hartman-Altenbernd; Kelly Altenbernd; and Toscana Developers, LLC jointly and severally in the amount of $200,000.

(3)  The Clerk will please enter judgments in accordance with the above. The case shall not be closed at this time, because the court has not yet resolved the veil-piercing claim concerning the liability of defendant Estes Development.

DATED this 15th day of October 2012.

/s/ JOHN W. SEDWICK
UNITED STATES DISTRICT JUDGE